Albany MIB+K LLC v Trinity Bldg. & Constr. Mgt. Corp. (2025 NY Slip Op 50274(U))

[*1]

Albany MIB+K LLC v Trinity Bldg. & Constr. Mgt. Corp.

2025 NY Slip Op 50274(U)

Decided on February 25, 2025

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 25, 2025
Supreme Court, Albany County

Albany MIB+K LLC, Plaintiff,

against
Trinity Building and Construction Management Corp., RAYMOND HARPER and MAGGIE MCFLY'S ALBANY LLC, Defendants.

Index No. 901392-24

The French Firm, P.C.
Attorneys for Plaintiff
(Brett D. French, of counsel)
125 Wolf Road, Suite 103
Colonie, New York 12205
Clark Guldin, Attorneys at Law 
Attorneys for Trinity Building and Construction Management Corp.
(Janesa Urbano, of counsel)
242 West 36th Street, 9th Floor 
New York, New York 10018
and
20 Church Street, Suite 15 
Montclair, New Jersey 07042

Richard M. Platkin, J.

Defendants moved prior to answering under CPLR 3211 (a) (1) and (7) for dismissal of the complaint filed by plaintiff Albany MIB+K LLC ("Albany MIB+K") (see NYSCEF Doc No. 272 ["Complaint"]). 
In a Decision & Order dated September 10, 2024 (see NYSCEF Doc No. 347 ["Prior Decision"]), the Court dismissed the cause of action alleging a conspiracy to defraud among defendants Trinity Building and Construction Management Corp. ("Trinity"), Raymond Harper and Maggie McFly's Albany LLC ("Maggie McFly's").
Plaintiff's remaining cause of action, alleging that Trinity breached the implied covenant of good faith and fair dealing by suspending performance for nonpayment, was converted into a [*2]motion for summary judgment pursuant to CPLR 3211 (c), and this Decision & Order follows.
BACKGROUND
A. Plaintiff's Allegations
Plaintiff contracted with Trinity to provide general contracting services for the development of a Waxy's Modern Irish Bar & Kitchen ("Waxy's" or "Project") in certain space ("Space K-109") leased from Crossgates Mall ("Landlord") (see Complaint, ¶ 9). 
"Trinity understood Plaintiff Albany MIB+K's financing derived from various loans and personal investments from [its] members" (id., ¶ 15), and Trinity also "was privy to the terms of the [lease]" (id., ¶ 17). "Upon information and belief, . . . Trinity agreed to work with . . . Albany MIB+K on a rolling basis, understanding that funding and reimbursement would often be gradual, sometimes complicated, and, most importantly, also dependent on completion of the fit-out — as the Lease Agreement . . . could often be backloaded with incentive-based lease credits and cash infusions from the Landlord" (id., ¶ 21 [emphasis omitted]). 
By "May or June 2017," however, "Trinity became more interested in assisting . . . Harper displace . . . Albany MIB+K and procure [Space K-109] for a new Maggie McFly's restaurant" (id., ¶ 26). According to plaintiff, Trinity sought to "establish a more substantial business relationship with Defendant Harper to build more Maggie McFly's restaurants in the future" (id., ¶ 32). Trinity's alleged conspiracy with Harper and Maggie McFly's (collectively, "McFly Defendants") "occurred . . . after substantial investment into the fit-out and purchasing of the millwork had been expended by Albany MIB+K, and near a point where [its] work could be close to completion, ensuring that Albany MIB+K would reap the return benefit . . . of the cash allowances built into the Lease" (id., ¶ 28; see also id., ¶¶ 29-34). 
Instead, Trinity allegedly "set a string of dominoes in motion forcing the Landlord's hand in seeking an eviction of Plaintiff" (id., ¶ 36). "On June 23, 2017, Defendant Trinity shut down the worksite of Plaintiff Albany MIB+K, hours after receiving a demanded cash infusion on behalf of Plaintiff Albany MIB+K, in the amount of $500,000, which in turn caused the [L]andlord to lose confidence that the fit-out would be completed" (id., ¶ 37).
Following Trinity's demobilization, the Landlord commenced eviction proceedings (see id., ¶ 40). Nonetheless, "Albany MIB+K worked diligently to attempt to get the jobsite back up and running with . . . Trinity" in an effort to persuade the Landlord to "withdraw its default and lease termination notices, as well as summary eviction proceeding" (id., ¶ 41).
"Upon information and belief, based on repeated assurance from Defendant Trinity that. . . Trinity was maintaining its relationships with all subcontractors and working behind the scenes to restart the jobsite fit-out for Plaintiff . . . if Albany MIB+K could work things out with the Landlord regarding the aggregate allowances, Plaintiff Albany MIB+K filed Chapter 11 Bankruptcy . . ." (id., ¶ 42). 
"Unfortunately, [Trinity's] assurances . . . were knowingly false, and [Trinity's] reasoning for shutting down the jobsite was entirely intentioned on forcing Plaintiff Albany MIB+K out of the leasehold and providing a windfall to Defendant Harper for a new Maggie McFly's to take over the space" (id., ¶ 46). 
Plaintiff's lease was rejected in March 2018, and its "leasehold terminated as a matter of law within the bankruptcy proceeding," causing Albany MIB+K to lose "its investment in the commercial space, the leasehold, and all future business opportunity and profits" (id., ¶¶ 50, 52).
About four years later, in February 2022, plaintiff allegedly made three discoveries that [*3]prompted its commencement of this action: (i) Trinity and Harper had a preexisting working relationship; (ii) Trinity completed the fit-out for the Maggie McFly's that replaced Waxy's in Space K-109; and (iii) Trinity was involved in preparing kitchen plans for Maggie McFly's in November 2017 (see id., ¶ 53 [a-c]), "only five months after Trinity shut down the job site for Albany MIB+K, four months prior to Albany MIB+K's leasehold terminating, nine months prior to Maggie McFly's Albany being formed, and all while [Trinity] was communicating with [plaintiff] that . . . Trinity was still serving as [the] General Contractor" for Waxy's (id., ¶ 61).
B. This Litigation
Plaintiff commenced this action on February 6, 2024 though the filing of a Complaint alleging two causes of action.
The first cause of action, directed solely at Trinity, alleges breach of the implied covenant of good faith and fair dealing. "Although . . . Trinity demanded an immediate cash infusion of more than $500,000.00 to be paid on June 23, 2017, . . . Albany MIB+K caused payment of $500,000.00 to be paid to . . . Trinity in good faith to continue operations . . . at the leased premises" (id., ¶ 76). Nonetheless, based on "ulterior motives" involving the McFly's Defendants, Trinity suspended performance as "part of a scheme to realize gains that the agreement between . . . Trinity and Plaintiff implicitly denied" (id., ¶¶ 77-78).
The second cause of action alleges a conspiracy to defraud among Trinity and the McFly's Defendants. Plaintiff alleges that Trinity gave false assurances to Albany MIB+K "at the behest and benefit of [the McFly's Defendants]" to set "[the McFly Defendants] up with the leased premises" (id., ¶¶ 84-87). 
Defendants moved separately for the pre-answer dismissal of the Complaint, and the Court dismissed the conspiracy/fraud claim, concluding that plaintiff's allegations of wrongdoing were not pleaded with the particularity required by CPLR 3016 (b), and, in any event, "the fact that Trinity may have been exploring alternative means of recouping its investment in fitting out Space K-109 is not sufficient to permit the reasonable inference of fraud" (Prior Decision at 11).
As to the claim under the implied covenant, Trinity submitted numerous emails showing "that [it] repeatedly gave notice to Albany MIB+K that the Project would be closed unless [its] substantial past-due balance was paid in full," which did not happen (id. at 16 [emphasis added]). The same collection of emails showed that plaintiff did not deny Trinity's claims of persistent nonpayment, did not dispute the substantial past-due balance claimed by Trinity and did not challenge Trinity's right to invoice its work on a monthly basis. To the contrary, plaintiff's communications "clearly recognized [Albany MIB+K's] obligation to obtain funding for the Project, and its emails to Trinity were replete with promises of imminent financing and payment" (id. at 17; see also id. at 13-15). 
Although the Court found the emails between the parties at pertinent times to be "credible and persuasive evidence that Trinity acted in a good faith and commercially reasonable manner and that [its] decision to close the Project on June 23, 2017 due to plaintiff's failure to fully resolve its substantial past-due balance was not [arbitrary or irrational]" (id. at 17), the Court concluded that the email exchanges did not "incontrovertibly refute plaintiff's allegations of bad faith, as it [was] possible for their contents to be controverted by other evidence, even if [plaintiff] did not contemporaneously dispute their contents" (id. [internal quotation marks, brackets and citation omitted]). 
Accordingly, the Court exercised its discretion to convert the branch of Trinity's motion seeking dismissal of the implied covenant claim into one for summary judgment under CPLR [*4]3211 (c). "If Albany MIB+K possesses admissible evidence showing that Trinity's decision to close the Project for nonpayment of the substantial past-due balance violated an implied obligation that a reasonable person in plaintiff's position would be justified in understanding, then Albany MIB+K should lay bare its proof" (id. at 18). 
Finally, in ordering conversion, the Court rejected plaintiff's contention that discovery was required to oppose summary judgment. In addition to the voluminous record of electronic correspondence exchanged between the parties at critical times, the Court identified three other categories of proof already in the possession of the parties that may be determinative of the implied covenant claim: "(i) the terms of [plaintiff's] contract with Trinity, which was formed on the objective basis of mutual assent; (ii) the objective reasonableness of Trinity's decision to close the Project on June 23, 2017, insofar as it constituted the discretionary exercise of a contractual right . . . ; and (iii) the implied promises, if any, that a reasonable person in plaintiff's position would have been justified in understanding were included in the contract with Trinity" (id.).
ANALYSIS
The movant for summary judgment "must establish [its] prima facie entitlement to judgment as a matter of law by adducing sufficient competent evidence to show that there are no issues of material fact" (Staunton v Brooks, 129 AD3d 1371, 1372 [3d Dept 2015] [citations omitted]). If the movant fails to satisfy this burden, the motion must be denied "regardless of the sufficiency of the opposing papers" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). 
However, if the movant has made the requisite showing, the burden shifts to the party opposing the motion to demonstrate, by admissible proof, either the existence of a triable issue of fact or an acceptable excuse for the failure to make such a demonstration (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). All evidence must be viewed in the light most favorable to the opponent of summary judgment (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), but "mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient to defeat summary judgment" (Justinian Capital SPC v WestLB AG, 28 NY3d 160, 168 [2016] [internal quotation marks and citations omitted]).
"[A] summary judgment motion is properly denied as premature when the nonmoving party has not been given reasonable time and opportunity to conduct disclosure relative to pertinent evidence that is within the exclusive knowledge of the movant" (Metichecchia v Palmeri, 23 AD3d 894, 895 [3d Dept 2005]; see CPLR 3212 [f]). But "[t]he mere hope that evidence sufficient to defeat the motion may be uncovered during the discovery process is not enough"; the nonmoving party "must produce some evidence indicating that further discovery will yield material and relevant evidence" (Stoian v Reed, 66 AD3d 1278, 1280-1281 [3d Dept 2009] [internal quotation marks and citations omitted]). 
A. Trinity's Proof
Trinity has submitted ample evidence that the parties operated under a contractual arrangement that allowed it to invoice Albany MIB+K on a monthly basis and obliged Albany MIB+K to pay such invoices within thirty (30) days. This proof includes extensive email correspondence between the parties, which is detailed in the Prior Decision, as well as the [*5]affidavit of Trinity's president, Mathew Kilty, with annexed exhibits (see NYSCEF Doc Nos. 352-354). 
Trinity acknowledges that the contract for the buildout of Waxy's was "oral" (NYSCEF Doc No. 350 ["MOL"] at 5). The parties' first documented interaction regarding payment terms was on December 10, 2016, about three months prior to Trinity starting the Project. A representative of Albany MIB+K requested "typical Trinity contract docs" (NYSCEF Doc No. 353), and Trinity responded with a "sample contract" (id.), which was a version of the AIA Form A107-2007, captioned "Standard Form of Agreement Between Owner and Contractor for a Project of Limited Scope" (NYSCEF Doc No. 354 ["modified AIA Form"]). The modified AIA Form contained Trinity's standard terms, some of which deviated from the AIA model, but omitted Project-specific information. The modified AIA Form called for monthly progress payments, with 10% retainage, payable in thirty (30) days (see id., Article 4; see also NYSCEF Doc No. 352 ["Kilty Aff."], ¶ 9).
In accordance with Trinity's "typical" financial terms, Kilty informed Paul McKenna, a principal of Albany MIB+K, "that Trinity did not require a large upfront deposit but may request a small amount for mobilization (which Trinity did not request), and that Trinity would bill Plaintiff monthly and expected payment within thirty days consistent with the terms set out in the Trinity modified AIA Form" (Kilty Aff., ¶ 10). 
Following some back-and-forth over pricing, Trinity provided plaintiff with an updated Project budget of about $2.23 million (see id., ¶¶ 11-12; see NYSCEF Doc No. 294). "Paul [McKenna] agreed to those terms, and Trinity began work in March 2017" (Kilty Aff., ¶ 12).
Trinity operated under the framework of monthly billings set forth in the modified AIA Form, issuing Applications for Payment on March 21, 2017, April 25, 2017 and May 30, 2017 (see NYSCEF Doc Nos. 296-297, 299). Albany MIB+K did not dispute Trinity's right to submit the monthly payment requisitions or challenge the amounts claimed by Trinity.
By June 2017, Trinity claimed a balance of more than $1 million in unpaid, undisputed Applications for Payment, and the parties' relationship had become severely frayed due to the financial issues. Thus, on June 15, 2017, Kilty wrote again to McKenna:
. . . [A]t every step of the way you guys led me to believe that you had financing in place. You asked me early on of our payment terms and I informed you that we did not require huge deposits that there would be a small requisition for mobilization (which we did not do) and then we would bill you monthly with 30 day terms . . . Ever since the first check bounced, we've been told its coming and when I met with you and Ashok . . . there was a plan laid out and it didn't happen. So I agree, it absolutely is a last resort [shutting down the job] and it doesn't "help" but it stops the "hurt" on my end . . . (id., ¶ 19, quoting NYSCEF Doc No. 302 at 000172).
Further confirmation of the parties' agreement for billing and payment is found in Trinity's response to a January 12, 2018 email from the Landlord, inquiring as to whether Trinity would charge a remobilization fee if Albany MIB+K paid the full "$1,170,608.44 owed" (NYSCEF Doc No. 331 at 002869). Kilty responded that no remobilization fee would be required; the parties would "'go back to standard AIA billing terms on a percentage completed basis with monthly pay apps due net 30'" (id. at 002868 [emphasis added]; see Kilty Aff., ¶ 20).
The Court concludes that the foregoing proof, together with emails and other evidence discussed in the Prior Decision, utterly refute plaintiff's allegation that Trinity agreed to accept [*6]payment on a "rolling basis, understanding that funding and reimbursement would often be gradual, sometimes complicated, and . . . dependent on completion of the fit-out" (Complaint, ¶ 21). The same proof shows that Trinity closed the Project based on plaintiff's persistent nonpayment of invoices, the outstanding balance of more than $1 million, and plaintiff's inability to identify a credible source of Project financing (see id., ¶ 78; see also Prior Decision at 16-17). 
As to plaintiff's surmise that "Trinity had an improper motive in deciding to cease work at the Project" — a motive based on developing a future relationship with the McFly Defendants, rather than the risk of "greater financial exposure for itself, its [sub]contractors, and suppliers" (MOL at 13) — Kilty avers that he was not involved with the 2016 project in Virginia that Trinity performed for Harper, and he did not even meet Harper until August 2018, which was "after Harper had reached out to Trinity about completing the build-out in [Space K-109]" (Kilty Aff., ¶¶ 23-28).
Kilty's account is confirmed by Paul Mancini, the Trinity executive who worked with Harper on the Virginia project (see NYSCEF Doc No. 351 ["Mancini Aff."], ¶¶ 2-7). After completing that project in May 2017, Harper asked Trinity to bid on two other Virginia projects, neither of which came to fruition (see id., ¶ 8). It was not until April 2018 that Harper contacted Trinity about fitting out the K-109 Space in Crossgates Mall for a Maggie McFly's (see id., ¶ 9).
The Court therefore concludes that Trinity has met its prima facie burden of showing that it acted in a good faith and commercially reasonable manner in its dealings with plaintiff, and the decision to suspend performance on June 23, 2017 was the product of plaintiff's persistent breaches of the payment terms of the parties' contract and plaintiff's inability to fully resolve the substantial past-due balance.
B. Plaintiff's Opposition
The only evidence submitted in opposition to summary judgment is a brief affidavit from plaintiff's principal, Paul McKenna (see NYSCEF Doc No. 360 ["McKenna Aff."]), with two exhibits annexed thereto: (i) a "demonstrative" collection of "communications" between the parties regarding "Trinity's intention to keep subcontractors from filing liens, or from terminating their relationship with Defendant Trinity and the job, so to allow Plaintiff . . . to work out a deal with the landlord" (id., ¶ 7; see NYSCEF Doc No. 361 ["communications"]); and (ii) a copy of the kitchen plan for Maggie McFly's that was filed with the municipal building permit application (see McKenna Aff., ¶ 12; see also NYSCEF Doc No. 362 ["Kitchen Plan"]).
In addition, plaintiff's counsel affirms that summary judgment is premature due to the need for discovery. "[F]acts may exist that indicate that well prior to . . . Trinity walking off the job, they were engaging with . . . Harper to establish a Maggie McFly's restaurant in . . . Albany MIB's leased space at Crossgates Mall, and Plaintiff cannot be expected to already have possession of or access to such evidence or facts" (NYSCEF Doc No. 363 ["French Aff."], ¶ 6). Such facts would be "in addition to the clear record that . . . Trinity had begun working a Maggie McFly's restaurant in the space as early as November 2017, just a month after Plaintiff . . . filed for Chapter 11 Bankruptcy reorganization in order to work out the lease agreement with the [Landlord]" (id., ¶ 7). 
After "incorporat[ing] by reference the allegations set forth in the Complaint" (McKenna Aff., ¶ 3), McKenna acknowledges that the $500,000 paid to Trinity on June 23, 2017 was less than the "amounts claimed to be owed by . . . Trinity" and that, "after receiving [only] partial payment, . . . Trinity shut down the job site" (id., ¶¶ 4-5). Notably, McKenna does not dispute [*7]Trinity's right to submit monthly pay applications, Albany MIB+K's obligation to pay those applications within thirty days, the outstanding balance of more than $1 million claimed by Trinity, or the commercial reasonableness of Trinity's decision to suspend performance for nonpayment.
McKenna "does dispute," however, "the reasoning for . . . Trinity walking off the job, and . . . [its] repeated assurances" that "Trinity would restart the job site" should Albany MIB+K "be able to secure financing, and/or work out an arrangement with the [Landlord] to assign cash allowances" (id., ¶ 6). McKenna avers that there were "[s]ignificant communications" with "Trinity between June 23, 2017 and October 2, 2017 regarding . . . Trinity's intention to keep subcontractors from filing liens, or from terminating their relationship with . . . Trinity and the job, so to allow Plaintiff . . . to work out a deal with the [Landlord]" (id., ¶ 7). These communications are said to "span several hundreds of pages of emails . . . , some of which are attached hereto as Exhibits 'A' for demonstrative purposes" (id.). 
Although Exhibit A purports to include a collection of "demonstrative" communications between the parties from June 23, 2017 to October 2, 2017 (id., ¶ 7), the exhibit actually consists of only one email from June 28, 2017, just five days after Trinity suspended performance, and that email merely inquired how plaintiff wanted Trinity to respond to the Landlord's request "for a status update on payment/remobilization" (NYSCEF Doc No. 361). According to McKenna, however, the email implies that Trinity "walked off the job to force payment but [was] still allegedly on board with the project — implications which were in fact not true, based on . . . Trinity's contradictory dealings with [Harper]" (McKenna Aff., ¶ 8). 
But even assuming that to be the case, Exhibit A (and similar emails in plaintiff's possession) are cumulative of evidence previously submitted by Trinity. In moving for dismissal, Trinity submitted abundant evidence that it remained in communication with plaintiff after closing the Project and consistently offered to re-mobilize if paid in full (see Prior Decision at n 4; see also NYSCEF Doc No. 311 at 000525; NYSCEF Doc No. 315 at 000830 ["we need every penny outstanding"]; NYSCEF Doc No. 320 at 000875 ["I want our money, I want you to get your financing and I want to finish the jobs and get you open for business."]; NYSCEF Doc No. 326 at 000606 [the "real holdup" to remobilizing is plaintiff paying the outstanding balance]; NYSCEF Doc No. 327 at 001827 [setting "a final, and . . . generous, deadline of 2 weeks to make payment of all past due money"]; NYSCEF Doc No. 329 at 001972 ["We gave you the amount we need to restart several times."]). Trinity told the Landlord the same thing in January 2018 (see Kilty Aff., ¶ 20; see also NYSCEF Doc No. 331 at 002868-002869).
Thus, despite having been given the opportunity to "lay bare its proof" (Prior Decision at 18), and despite claiming to possess "[s]ignificant communications" in the form of "several hundreds of pages of emails" (McKenna Aff., ¶ 7), plaintiff submitted just one email and that email is wholly cumulative of the evidence addressed in the Prior Decision.
The other major problem with plaintiff's opposition is that it rests on the contention that Trinity did, in fact, engage in "contradictory dealings with [the McFly's Defendants]" at pertinent times (id., ¶ 8). Plaintiff's speculation that Trinity left the Project due to an ulterior motive involving the McFly Defendants, rather than on account of persistent nonpayment, is said to find support in Trinity's involvement in the preparation of a kitchen plan for Maggie McFly's in November 2017, which was shortly after plaintiff's bankruptcy filing and during the pendency of plaintiff's efforts to resolve its financial issues with the Landlord (see id., ¶¶ 10-11). McKenna submits a copy of this Kitchen Plan and attests that it was filed as part of a municipal [*8]permit application dated November 27, 2017 (see id., ¶ 12). 
However, careful review of the Kitchen Plan shows that it was revised on "07-19, 07-23, 7-24, 07-25, 8-02-18, 08-06-18, 08-21-18" (NYSCEF Doc No. 362), making a filing date prior to August 21, 2018 impossible. Moreover, the August 21, 2018 date of the last revision is consistent with Trinity's proof that it was not approached by Harper until April 2018 (see Mancini Aff., ¶¶ 9-10; see also Kilty Aff., ¶ 26), as well as with the now-sworn allegation of plaintiff's complaint that the "building permit for Maggie McFly's was dated February 26, 2019" (Complaint, ¶ 58).
The Court therefore concludes that plaintiff has not offered any admissible evidence showing that Trinity was working with the McFly Defendants regarding Space K-109 prior to the termination of Albany MIB+K's leasehold interest, and plaintiff's allegation that Trinity closed the Project due to such a relationship rests entirely on speculation and surmise. 
And even if plaintiff had adduced competent proof of some ulterior motive on Trinity's part, the fact remains that Albany MIB+K was on clear notice of the consequences of its persistent breaches of the express payment terms of the parties' contract, and it cannot avoid those consequences by resort to the implied covenant. The contract entitled Trinity to prompt payment, and that express, bargained-for right cannot be nullified through a claim of an implied promise (see Fesseha v TD Waterhouse Inv. Servs., 305 AD2d 268, 268 [1st Dept 2003] [implied covenant "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights"]; see also Singh v City of New York, 40 NY3d 138, 146 [2023]; Integrity Intl., Inc. v HP, Inc., 211 AD3d 1194, 1199 [3d Dept 2022]). 
The implied covenant serves to effectuate the parties' reasonable expectations, not to negate express contractual rights (see Murphy v American Home Prods. Corp., 58 NY2d 293, 304 [1983]), and plaintiff has not identified any implied promise, independent of Trinity's right to receive timely payment and to suspend performance for nonpayment, that a reasonable person would have understood to be part of the contract.
For all of the foregoing reasons, the Court concludes that plaintiff has not raised a triable issue of fact in opposition to Trinity's prima facie showing that it exercised its right to suspend performance in a good faith and commercially reasonable manner in response to plaintiff's persistent inability to remedy its substantial overdue balance.
Finally, the Court finds that plaintiff has not shown that summary judgment is premature. Under CPLR 3212 (f), a party opposing summary judgment on the ground that additional discovery is needed must demonstrate a reasonable basis to believe that "further discovery will yield material and relevant evidence" (Stoian, 66 AD3d at 1280 [internal quotation marks and citations omitted]). 
Having rejected plaintiff's claim of a "clear record that . . . Trinity had begun working on a Maggie McFly's restaurant in the space as early as November 2017" (French Aff., ¶ 7), there simply is no evidence that Trinity was working with the McFly Defendants prior to the termination of plaintiff's leasehold interest or that Trinity otherwise engaged in bad-faith conduct. Under the circumstances, plaintiff's speculation and hope that discovery may uncover such evidence "is not enough" to warrant denial of Trinity's motion (Stoian, 66 AD3d at 1280-1281 [internal quotation marks and citations omitted]).
CONCLUSION
Accordingly, it is
ORDERED that the branch of Trinity's motion seeking dismissal of the claim for breach of the implied covenant of good faith and fair dealing, converted into one for summary judgment, is granted, and the first cause of action is dismissed; and finally it is
ORDERED that the Complaint is dismissed in its entirety.
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for Trinity shall promptly serve notice of entry on all parties entitled to such notice.
Dated: February 25, 2025
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 350-354, 360-364.[FN1]

Footnotes

Footnote 1:The Court takes judicial notice of the prior filings and proceedings herein (see also CPLR 2214 [c]).